**Robert G. LILE, Plaintiff,**

v.

**David R. McKUNE, et al., Defendants.**

**No. 95–3266–DES.**

United States District Court,
D. Kansas.

Sept. 16, 1998.

Brett D. Leopold, Stinson, Mag & Fizzell, P.C., Kansas City, MO, David V. Byrd, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, David J. Waxse, Paul W. Rebein, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Plaintiff.

John R. Dowell, Office of Attorney General, Topeka, KS, Lawrence J. Logback, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, Timothy G. Madden, Kansas Department of Corrections, Topeka, KS, for Defendant.

### *MEMORANDUM AND ORDER*

SAFFELS, Senior District Judge.

Plaintiff, a prisoner confined in Lansing Correctional Facility in Lansing, Kansas, proceeds in forma pauperis and with appointed counsel to challenge the constitutionality of a sex offender treatment program required by the Kansas Department of Corrections ("DOC"). Before the court are cross motions for summary judgment by the parties.

### BACKGROUND

A jury convicted plaintiff in 1983 of kidnaping, rape, and aggravated sodomy. Plaintiff denied all charges and testified at trial that his conduct with the victim, including sexual intercourse, was consensual. The Kansas appellate courts affirmed plaintiff's conviction. At the time he filed his complaint, plaintiff had a petition for writ of habeas corpus under 28 U.S.C. § 2254 pending before this court in which he alleged constitutional error in his state court conviction. Plaintiff is currently incarcerated at Lansing Correctional Facility ("LCF") in Lansing, Kansas, serving a controlling life sentence.

When plaintiff was first incarcerated, DOC staff determined the sex offender treatment program would not be required. In 1994, plaintiff's Unit Team Counselor added the Sex Offender Treatment Program ("SOTP," the precursor to the current program, Sexual Abuse Treatment Program "SATP"), a

clinical rehabilitation program, to plaintiff's inmate program agreement ("IPA"). After exhausting administrative remedies on an unsuccessful grievance challenging the addition of this programming, plaintiff signed the modified IPA, but refused to participate in the recommended program which required the signing of an "Admission of Guilt" form.[1]

In 1995, DOC amended state regulations[2] and revised its internal management policies and procedures ("IMPP"). The revised IMPP 11–101, effective January 1, 1996, is characterized as an incentive level system that links privileges and custody classifications to successful prison accomplishment, such as the completion of required programming. As applied to plaintiff, the documented failure to complete a recommended program on his IPA would automatically impair his ability to earn good time, and would result in his transfer to maximum custody and the loss of privileges for that review period. These consequences, acknowledged as part of the "incentive" for completion of recommended programming, mirror the consequences imposed for serious disciplinary infractions.[3]

The resulting conditions in maximum custody go beyond the lack of a personal television. Plaintiff would be placed in a more dangerous environment occupied by more serious offenders. He would not be able to earn more than $0.60 a day for prison pay, and he would not be eligible for industries work. Visitation would be restricted to attorneys, clergy, law enforcement and his immediate family. Other approved visitors would not be allowed. Available programming would be limited, as would the amount of personal property he could retain in his cell.

In addition to signing an "Admission of Guilt" form, plaintiff objected to the SATP requirement that all participants generate a written sexual history which includes all prior sexual activities, regardless of whether such activities constitute uncharged criminal offenses. Polygraph examinations are used to verify the accuracy and completeness of the offender's sexual history. Plethysmograph testing is used for diagnostic and treatment purposes. The results of the plethysmograph and polygraph exams are to be discussed in group therapy sessions. Although participants are instructed to keep confidential the information elicited during the therapy sessions, and may be terminated from the program for failing to do so, the confidentiality of this information is expressly limited. The parties acknowledge that Kansas law requires SATP staff to report any disclosed uncharged sexual offense,[4] and that all SATP participant files are subject to subpoena.

In cross motions for summary judgment, the parties seek resolution of two constitutional issues. The first is whether the operation of the SATP and related prison regulations and policies violates plaintiff's constitutional right against self incrimination. Second is whether the SATP Program at LCF is conducted in a manner impermissibly invasive of plaintiff's constitutional right to privacy and bodily integrity.

## SUMMARY JUDGMENT STANDARDS

Under the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

1. After plaintiff filed this lawsuit, DOC retitled the "Admission of Guilt" form to read "Admission of Responsibility," and added the statement that SATP was a voluntary program.

2. The 1995 amendments to K.A.R. 44–6–124 and 44–6–142 provide for the withholding of 100% of the good time credits for each classification review period of an inmate who refuses to participate in assigned programming. The 1995 amendments further require that all good time credits are now to be earned as the sentence progresses, rather than presumed based upon the maximum sentence and subject to forfeiture only for misconduct.

3. The policy, as clarified February 1, 1996, also automatically subjects a prisoner to the same restrictions upon a disciplinary work conviction, upon the filing of felony charges by a state prosecutor, or upon disciplinary convictions for serious offenses such as theft, riot, arson, relationship with staff, and possession of contraband. IMPP 11–101, Section IV.B.1–4.

4. See K.S.A. 38–1522 (mandated reporting of abuse or neglect of children).

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing summary judgment motions, the evidence must be viewed in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

The fact that both parties have filed cross-motions for summary judgment does not change this standard of review. *Taft Broadcasting Co. v. U.S.*, 929 F.2d 240, 249 (6th Cir.1991). The court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387, 1391 (Fed.Cir. 1987).

### DISCUSSION

*Fifth Amendment*

■■ The Fifth Amendment, applicable to the states through the Fourteenth Amendment,[5] provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Art. V. The Amendment "must be accorded liberal construction in favor of the right it was intended to secure," *Hoffman v. U.S.*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), and it clearly extends to incarcerated prisoners, *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

■■ The constitutional right against self-incrimination turns not on the type of proceeding, but the nature of the statement or admission that is invited. *Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The Fifth Amendment "privileges [the individual] not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings . . . unless and until he is protected at least against the use of his compelled answers." *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 78, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)).

■ The privilege should be affirmatively and timely asserted. *Murphy*, 465 U.S. at 429, 104 S.Ct. 1136. A state does not abridge the right against self-incrimination when an individual waives the privilege by communicating voluntarily. *U.S. v. Washington*, 431 U.S. 181, 186, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977).

There is a longstanding Supreme Court directive that the privilege against self-incrimination is "as broad as the mischief against which it seeks to guard." *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). The "mischief" identified in the present case involves the State's acquisition of therapeutic confessions in the SATP Program at LCF.

■ Plaintiff first claims the significant adverse regulatory consequences attendant to his refusal to fully participate in the SATP Program at LCF unconstitutionally compels his disclosure of potentially incriminating information without the protection of immunity.[6] Secondly, plaintiff claims he should not

---

**5.** *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**6.** Plaintiff also contends the incriminating information could be used in a commitment proceeding against him under the Kansas Commitment of Sexually Violent Predators Act, K.S.A. 59–29a01 *et seq.*

The protection of the Fifth Amendment bars the use of compelled self-incriminating statements in a later criminal action against the declarant. It does not bar the use of such state-

ments in a later civil proceeding. *See e.g., Allen v. Illinois*, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (Fifth Amendment did not apply to civil involuntary commitment of sexually dangerous person). *Accord, Bankes v. Simmons*, 265 Kan. 341, 963 P.2d 412 (1998) (Fifth Amendment does not apply to SATP disclosures used in civil involuntary commitment proceedings).

In *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the Supreme Court found the commitment proceedings under the Kansas Act to be civil in nature. Thus, it is

be punished by operation of IMPP 11–101 for asserting his right against self incrimination.

Defendants contend the Fifth Amendment is not applicable to this non-criminal setting, and maintain there is no compulsion in this voluntary program. Defendants further argue the withholding of discretionary privileges is allowable if plaintiff refuses to participate in required prison programming. Defendants do not dispute plaintiff's claim that no express immunity is provided to SATP participants.

The court first examines whether there is merit to plaintiff's Fifth Amendment claim, and if so, the remedy to afforded in this case.

*Fifth Amendment—Incrimination*

The court easily finds the information required to be disclosed under the SATP Program is sufficiently incriminating for Fifth Amendment purposes.

 "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman,* 341 U.S. at 486–87, 71 S.Ct. 814. The privilege "protects against any disclosures that the witness reasonably believes could be used in a criminal

prosecution or could lead to other evidence that might be so used." *Kastigar v. U.S.,* 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Although the fear of prosecution must have some foundation, the assertion of the privilege does not depend on the likelihood of future prosecution. *U.S. v. Jones,* 703 F.2d 473, 477–78 (10th Cir.1983).

 By requiring the complete and written disclosure of a prisoner's sexual history, including all uncharged sexual offenses, SATP clearly seeks information that could incriminate the prisoner and subject him to further criminal charges.[7]

Because the sexual history disclosure clearly satisfies the incrimination inquiry, the court does not decide whether a written "admission of responsibility" of plaintiff's behavior leading to his convicted offense, standing alone, would be sufficiently incriminating to invoke the protection of the Fifth Amendment.[8]

*Fifth Amendment—Compulsion*

 The court also finds the SATP Program at LCF, in conjunction with DOC policies and practices, operates to compel the disclosure of such incriminating testimony.

Compulsion is the "touchstone of the Fifth Amendment." *Lefkowitz v. Cunningham,*

now clear that in such proceedings, the Fifth Amendment privilege against self incrimination would not be offended by the use of incriminating information elicited in the sex offender treatment program.

**7.** Where no confidentiality is afforded such disclosures in SATP, similar programs operating with greater confidentiality can be easily distinguished. *See Chambers v. Bachicha,* 39 F.3d 1191 (unpublished decision), 1994 WL 596702 (10th Cir.1994) (no Fifth Amendment violation found, in part, due to recognized confidentiality of prison records, and no evidence that confidentiality provision had been or ever would be breached).

**8.** Courts are not hesitant to find incrimination if a prisoner's direct appeal could be affected by such an admission. *See e.g., Taylor v. Best,* 746 F.2d 220, 222 (4th Cir.1984) (privilege against self-incrimination applies to questioning about the charged offense while the declarant's appeal from that conviction is pending), *cert. denied,* 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 340 (1985). It is also recognized that an admission after the exhaustion of the direct appeal may still be in-

criminating. *State of Montana v. Imlay,* 249 Mont. 82, 813 P.2d 979 (1991) (post-conviction remedies would be rendered meaningless by compelled admission of guilt), *cert. granted,* 503 U.S. 905, 112 S.Ct. 1260, 117 L.Ed.2d 489, *cert. dismissed as improvidently granted,* 506 U.S. 5, 113 S.Ct. 444, 121 L.Ed.2d 310 (1992).

In this case, plaintiff's conviction has been rendered final by exhaustion of all direct review. Any admission of guilt now only potentially threatens collateral review, and has only a distant or speculative chance of affecting this presumptively valid conviction. *See e.g., Neal v. Shimoda,* 131 F.3d 818, 833 (9th Cir.1997) (where no challenge to the conviction and no evidence that the inmate intends attempt to withdraw plea, there is only a remote and speculative possibility that inmate's admission to sex offenses will be incriminating in a future criminal proceeding).

There still remains, however, the possible criminal charge of perjury where plaintiff testified in court that he did not commit the offense, and then declares otherwise in a written "admission of responsibility." *See* K.S.A. 21–3805 (criminal offense of perjury).

431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). While there is no compulsion if the incriminating testimony elicited is truly voluntary, the undisputed facts in the record do not lead to such a finding in this case.

In *Ohio Adult Parole Authority v. Woodard*, —— U.S. ——, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), the Supreme Court held that the pressure to divulge potentially incriminating evidence in a voluntary clemency interview does not constitute compulsion under the Fifth Amendment. *Id.* 118 S.Ct. at 1253. That holding rests squarely on a finding that the clemency proceeding was voluntary. Other than the consequence to the prisoner's chance of obtaining clemency, no automatic administrative sanction attached to that prisoner's refusal to divulge the requested information. This is consistent with Supreme Court precedent that the choice to waive the privilege against self-incrimination is considered voluntary only if the individual suffers no such penalty as a result.[9] *Murphy*, 465 U.S. at 428, 104 S.Ct. 1136.

██ However, when the government compels incriminating testimony by threat of "potent sanctions," the testimony is obtained in violation of the Fifth Amendment and cannot be used against the declarant in a later criminal proceeding. *Cunningham*, 431 U.S. at 805, 97 S.Ct. 2132 (*citing Garrity v. State of N.J.*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967)). A waiver secured under threat of such sanction cannot be termed voluntary. *Turley*, 414 U.S. at 82–83, 94 S.Ct. 316.

In the present case, plaintiff's refusal, on constitutional grounds, to participate in the SATP Program would be considered voluntary within the ambit of *Woodard* if the consequences were limited to the effect of such refusal on the parole board's discretionary decision of whether to grant plaintiff parole. However, the prison administrative sanctions attendant to plaintiff's refusal, automatically imposed by operation of IMPP 11–101, clearly go further and defeat defendants' claim that plaintiff's participation in the challenged program constitutes a voluntary waiver of plaintiff's rights under the Fifth Amendment.[10]

The Kansas Supreme Court recently found SATP's required "admission of responsibility" and disclosure of uncharged sexual offenses violated a prisoner's rights under the Fifth Amendment. *Bankes v. Simmons*, 265 Kan. 341, 963 P.2d 412 (1998). In that case, as in the case presently before this court, the prisoner-plaintiff had asserted his right under the Fifth Amendment in refusing to comply with SATP programming requirements. Each testified at trial to deny the offense, and thus was subject to the charge of perjury upon an admission of guilt in SATP. Each had some form of judicial review of his conviction pending at the time he was required to comply with SATP program requirements.

The compulsion identified in *Bankes* arose out of the state prison regulations applicable to the prisoner's refusal to participate in the SATP Program. The Kansas Supreme Court found operation of the 1995 state regulations unconstitutionally lengthened the prisoner's period of incarceration by withholding good time credits that had been presumed in calculating the prisoner's condition-

---

9. *Woodard* also reflects court decisions finding no Fifth Amendment violation in presenting a criminal defendant with difficult or tactical choices such as waiving the right against self-incrimination by entering a guilty plea, *Godinez v. Moran*, 509 U.S. 389, 398, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), or admitting responsibility for the purpose of obtaining a reduction in sentence, *e.g. U.S. v. Trujillo*, 906 F.2d 1456 (10th Cir.), *cert. denied*, 498 U.S. 962, 111 S.Ct. 396, 112 L.Ed.2d 405 (1990).

10. The court notes defendants' insistence that IMPP 11–101 involves the withholding of administrative "incentives" rather than imposition of administrative "sanctions." The distinction has little significance where plaintiff faces the loss of present and more favorable classification and privileges solely as a result of his refusal, on constitutional grounds, to participate. in the SATP Program.

The court further finds the administrative sanctions at issue operate automatically upon plaintiff's refusal to comply with the SATP Program requirements. Although defendants indicate prisoners can successfully complete the SATP Program at LCF without undergoing the plethysmograph and polygraphy testing, their examples cite individuals in the program before such testing was implemented, or individuals with medical problems. There is nothing in the record to suggest that plaintiff would fit either category.

al release date upon his incarceration prior to the 1995 change in the regulations.

In the present case, plaintiff's argument focuses instead on the operation of prison policy IMPP 11–101 which imposes significant and adverse consequences to plaintiff's classification, housing, and privileges if he refuses to participate in the required programming.

The adverse consequences of prison policies and practices have been examined in the context of raising a constitutional claim. In *Lucero v. Gunter*, 17 F.3d 1347 (10th Cir. 1994), the court recognized that although the challenged urinalysis testing was reasonable under the Fourth Amendment, the adverse consequences attendant to the prisoner's refusal to submit to testing were sufficient to establish standing to raise the constitutional claim.[11]

Here, defendants essentially argue that no compulsion results pursuant to the adverse consequences under the revised IMPP 11–101 because no protected liberty interest is implicated where the prisoner is not subjected to conditions atypical to his incarceration. *See e.g., Bollig v. Fiedler*, 863 F.Supp. 841 (E.D.Wis.1994) (due process claim defeated because no protected liberty interest in right to be free of forced participation in prison educational rehabilitation program).

However, by grafting a protected liberty interest to a finding of compulsion, the standard is set too high. Whereas no *atypical* hardship may be at issue, and thus no threat to an interest protected by the Due Process Clause, there remains the possibility that the hardship attendant to a prisoner's refusal to participate in the SATP Program is sufficient compulsion for purposes of the Fifth Amendment. The Supreme Court has recognized that compulsion under the Fifth Amendment can be established by the threat of a substantial economic burden, notwithstanding the fact that no enforceable property interest or claim may be at risk. *Cunningham*, 431 U.S. at 807, 97 S.Ct. 2132.

Within the context of plaintiff's incarceration, operation of IMPP 11–101 clearly presents such a costly burden to plaintiff's exercise of his rights under the Fifth Amendment. *See e.g. Neal*, 131 F.3d at 829 (coercive effect of sex offender treatment program recognized where non-completion of program renders inmate ineligible for parole); *McMorrow v. Little*, 109 F.3d 432 (8th Cir.1997) (Fifth Amendment protects prisoner's refusal to admit to crime where prisoner threatened with loss of benefits, including the withholding of parole and work release, and the withholding of less restrictive confinement).

If such administrative consequences were not present, IMPP 11–101 would not be impermissibly coercive under the Fifth Amendment. *See e.g., Russell v. Eaves*, 722 F.Supp. 558 (E.D.Mo.1989) (no compulsion found in the acceptance of responsibility by prisoners in state sexual offender treatment program where prisoners could refuse to participate and no administrative consequences identified as automatically attendant to such refusal), *appeal dismissed*, 902 F.2d 1574 (8th Cir.1990).

*Fifth Amendment—Immunity*

The court next turns to the consequences resulting upon plaintiff's valid assertion of his rights under the Fifth Amendment.

It is clear that citizens may not be forced to incriminate themselves simply because it serves a governmental need. *Turley*, 414 U.S. at 78–79, 94 S.Ct. 316. A legitimate state rehabilitative purpose for compelling disclosure does not make the disclosure any less incriminating. *Mace v. Amestoy*, 765 F.Supp. 847, 852 (D.Vt.1991).

The Supreme Court has recognized that if prisoners are compelled "to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered whatever immunity is required to supplant their privilege and may not be required to waive such immunity." *Baxter*, 425 U.S. at 316, 96 S.Ct. 1551 (quotations omitted). The sensible administration of a state rehabilitative system can create the need for a "rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Turley*, 414 U.S. at 81, 94 S.Ct. 316

---

11. The Fifth Amendment claim in *Lucero* was defeated because blood and urine samples were nontestimonial evidence, and thus did not implicate prisoner's right against self-incrimination.

(quoting *Kastigar*, 406 U.S. at 446, 92 S.Ct. 1653).

 Thus the state may, without violating the Fifth Amendment, require answers to potentially incriminating questions "as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." *Murphy*, 465 U.S. at 436 n. 7, 104 S.Ct. 1136. *See e.g. Baxter*, 425 U.S. at 318–19, 96 S.Ct. 1551 (where immunity against use of incriminating disclosures in subsequent criminal proceedings is assumed, Fifth Amendment did not bar use of inmate's silence in prison disciplinary proceedings).[12] *See Grand Jury Subpoenas Dated Dec. 7 and 8, to Stover v. U.S.*, 40 F.3d 1096, 1102–03 (10th Cir.1994) (scope of immunity against use of compelled self-incriminating statements outlined, following *Garrity*), *cert. denied*, 514 U.S. 1107, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995).

 The Kansas Supreme Court followed such course by extending immunity to incriminating SATP disclosures made by prisoners subject to the unconstitutional withholding of good time under the amended state regulations. *Bankes*, 265 Kan. 341, 963 P.2d 412, 1998 WL 289193 at *9. This court follows the same path. Where a prisoner asserts his constitutional right against self incrimination in the SATP Program at LCF, immunity protects all incriminating disclosures compelled by the operation of prison policy IMPP 11–101 from being used against plaintiff in later criminal proceedings.[13]

Notwithstanding the court's decision that interference with DOC's SATP programming

is not required, plaintiff has sustained his burden of demonstrating constitutional error and has obtained judicial relief on the claim. Plaintiff is granted summary judgment on his Fifth Amendment claim.

### Right to Privacy

Plaintiff claims the plethysmograph testing in the SATP Program violates his constitutionally protected right to privacy and bodily integrity.

Defendants use a penile plethysmograph examination in the SATP Program at LCF to develop specific treatment plans for the participating inmate. The plethysmograph assesses the degree of a test subject's sexual arousal, through changes in penile tumescence. The testing employs an electronic device consisting of a pressure-sensitive ring which is placed around a subject's penis to measure and record increases in penis size in response to various audio recordings of projective sexual scenarios presented from the perspective of a person committing a sexual offense. Inmates describe the audio recordings of various sexual scenarios as lasting about 40 minutes, and as including graphic and violent scenes of nonconsensual sexual behavior.

Plaintiff maintains he has a constitutional right to refuse plethysmograph testing[14] in the SATP Program at LCF. He claims plethysmography is an extremely intrusive procedure which is not accepted as scientifically valid and reliable, especially if such testing is against the prisoner's will. Plaintiff further

---

**12.** At issue in *Baxter* was the adverse use of a prisoner's silence at his disciplinary hearing. Recognizing the competition between the individual's assertion of privilege and the state's interest in prison disciplinary management, the Court authorized the imposition of consequences if the prisoner failed to answer questions that served state interests beyond that of a criminal conviction. *Accord, Shimabuku v. Britton*, 503 F.2d 38, 45 (10th Cir.1974) (use immunity for statements given in prison disciplinary proceeding accommodated competing interests in self-incrimination privilege and prison discipline).

*See generally*, Solkoff, Judicial Use Immunity and the Privilege Against Self-Incrimination in Court Mandated Therapy Programs, 17 Nova L.Rev. 1441 (1993) (courts to invest probationers with immunity to protect Fifth Amendment privilege and to further mandated treatment).

**13.** The court is not required to consider whether the refusal to comply with SATP disclosure requirements without assertion of the privilege is sufficient to satisfy any of the recognized exceptions to the general rule that the Fifth Amendment is not self-executing. *See e.g., Murphy*, 465 U.S. at 434–35, 104 S.Ct. 1136 (if sufficient penalty asserted for exercise of privilege, failure to assert privilege is excused).

**14.** Plaintiff also claims he has a constitutional right to refuse polygraph testing. Plaintiff's allegations regarding this form of testing rest on the alleged unreliability of the procedure. He does not allege the polygraph testing in the SATP Program at LCF invades a protected privacy interest. The court's analysis of plaintiff's Fourth Amendment privacy claim thus focuses on the challenged plethysmograph testing.

maintains the testing at LCF is conducted by unqualified and untrained personnel.

Defendants contend there is no privacy invasion because the program is voluntary, the nature of the program and testing is fully disclosed so that an inmate can make a knowledgeable decision to participate, and the inmates are not viewed or touched during the testing.

Among the uncontroverted facts in the record is the recognition that it is critical for the SATP clinician to create a therapeutic alliance with the sex offender to ensure successful rehabilitation and to ensure the sex offender is sincerely motivated to work on controlling his deviant behavior. The parties disagree whether IMPP 11–101 constitutes sufficient coercion to interfere with this requisite alliance. The assessment report prepared by the National Institute of Corrections, and used by defendants to develop the current SATP Program, does not address the need for, or the effect of, an incentive policy like that adopted in IMPP 11–101. The parties disagree whether a successful sex offender treatment program requires plethysmograph testing.

■■■■ The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Constitution, Art. IV. Where personal and deeply rooted privacy concerns are implicated, the Fourth Amendment "guarantees the privacy, dignity and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 613–14, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (citations omitted). It protects against intrusions not justified by the circumstances, or conducted in an improper manner. *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

■■■■ Although convicted prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison," *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court has recognized that incarceration necessarily limits the privileges and rights of convicted prisoners, *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d

495 (1974). It is established, for instance, that prisoners have no legitimate expectation of privacy in their cells, and that absent substantial evidence in the record that officials have exaggerated their response, a prisoner's expectation of such privacy must yield to institutional security concerns. *Wolfish,* 441 U.S. at 547–48, 99 S.Ct. 1861; *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

■■■ A search of a prisoner's body, however, is a qualitatively different matter. *Dunn v. White,* 880 F.2d 1188, 1190 (10th Cir.1989), *cert. denied,* 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990). A prisoner retains a privacy interest in the integrity of his own person. *Wolfish,* 441 U.S. at 558, 99 S.Ct. 1861. *See e.g. Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir.1995) (prisoner retains limited constitutional right to bodily privacy, particularly as to searches by staff members of opposite sex); *Hovater v. Robinson,* 1 F.3d 1063, 1068 (10th Cir.1993) (inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards).

■■■ A State's acquisition and examination of evidence may be a search under the Fourth Amendment if such governmental action "infringes an expectation of privacy that society is prepared to recognize as reasonable." *Skinner,* 489 U.S. at 616, 109 S.Ct. 1402. Accordingly, the collection of revealing private physiological data has been found to be an invasion of privacy interests. *Id.* at 617, 109 S.Ct. 1402.

■■■■ Whether the government is pursuing civil or criminal objectives, such intrusion into constitutionally protected privacy rights requires analysis of the reasonableness of the search under the Fourth Amendment. "[T]he permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619, 109 S.Ct. 1402 (quotation and citations omitted). *See e.g., Dunn,* 880 F.2d at 1193–94 (prison officials to balance intrusiveness of testing prisoner's blood for AIDS against the need for such testing). The reasonableness of the intrusion requires the examination of the nature of the search and of all the sur-

rounding circumstances. *Skinner,* 489 U.S. at 619, 109 S.Ct. 1402. Where privacy expectations are reduced and the intrusion of privacy interests is minimal, the Fourth Amendment demands less governmental justification than where a heightened privacy interest is involved. *Winston v. Lee,* 470 U.S. 753, 766, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); *Harrington v. Almy,* 977 F.2d 37, 44 (1st Cir.1992).

 In the present case, the court finds plaintiff's constitutionally protected right to privacy and bodily integrity is clearly implicated.[15] Similar to the Fourth Amendment protection extended to the collection and testing of urine in *Skinner,* plethysmograph testing requires the physical involvement of arguably the most private part of the inmate's body, for the purpose of recording and monitoring the physiological disclosure of sensitive and revealing information about the inmate's sexual response.

 Because the operation of IMPP 11–101 within the context of the SATP Program imposes consequences similar to prison disciplinary sanctions, the court finds sufficient compulsion for plaintiff to have standing to raise this constitutional claim. *See Lucero v. Gunter,* 17 F.3d 1347 (10th Cir.1994) (standing to raise Fourth Amendment claim established by adverse disciplinary consequences attendant to inmate's refusal to undergo urinalysis testing).

The court thus turns to the government's need for the private information obtained in such testing, and the reasonableness of the testing procedure.

Because plaintiff is incarcerated, the court's examination is guided by the rational relationship test outlined by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107

S.Ct. 2254, 96 L.Ed.2d 64 (1987). In *Turner,* the Court held that a prison regulation infringing on a constitutionally recognized right of a convicted prisoner is considered valid only if the regulation is reasonably related to a legitimate penological interest. *Id.* at 89, 107 S.Ct. 2254. This is a less restrictive standard than ordinarily applied to the review of alleged violations of constitutional rights. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). The *Turner* "reasonableness" standard attempts to reconcile the Court's "longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration." *Washington v. Harper,* 494 U.S. 210, 223–24, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

In *Turner,* the court identified four factors to be considered in determining whether the prison policy in question is "reasonably related" to legitimate penological goals, or whether the policy reflected an "exaggerated response" to those concerns. 482 U.S. at 87, 107 S.Ct. 2254. Courts have recognized that not all four factors are necessarily relevant to an inquiry in the context of the Fourth Amendment. *Dunn* 880 F.2d at 1193 n. 3. *See also Michenfelder v. Sumner,* 860 F.2d 328, 331 n. 1 (9th Cir.1988); *Frink v. Arnold,* 842 F.Supp. 1184 (S.D.Iowa 1994), *aff'd,* 43 F.3d 673 (8th Cir.1994). Accordingly, the analysis of a prisoner's constitutional privacy claim has often centered on the first factor, which is whether a valid and rational connection exists between the regulation and the penological interest offered to justify the regulation.[16] The balancing test in *Wolfish* is used to guide that analysis. *Dunn,* 880 F.2d

15. The court rejects plaintiff's alternative claim under the Fourteenth Amendment that the SATP Program at LCF violates his right to refuse medical treatment. In *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the Supreme Court recognized that an inmate retains a significant liberty interest, protected under the Due Process Clause, from being subjected to the arbitrary and erroneous forceful administration of medication. However, the rehabilitative treatment protocol being challenged in the present case is clearly distinguishable in its scope and purpose from the forced administration of anti-psychotic drugs in *Harper* as a

medical response to a threat of danger to the inmate and to others at the facility.

16. Plaintiff argues the remaining *Turner* factors, which address whether reasonable alternatives exist that can both accommodate the prison's needs and protect an inmate's rights, should be examined as well, and contend the alternative available in this case is to allow testing without the compulsion operating under IMPP 11–101. However, *Dunn* instructs that "[o]nce a court has concluded that a prison search is not unreasonable, there is no infringement of a constitutional right, and thus the issue whether there is a

at 1194 n. 3.; *Thompson v. Souza*, 111 F.3d 694, 699–700 (9th Cir.1997).

Here, the parties stipulate that the SATP Program at LCF is a clinical rehabilitative program. Rehabilitation is a legitimate penological objective. *See, O'Lone*, 482 U.S. at 348, 107 S.Ct. 2400 ("limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security"). Thus the underlying reason for the SATP Program at LCF is legitimate.

Next, the intrusion into an inmate's right to bodily integrity is significantly mitigated in this case by the fact that SATP staff neither touch nor observe the inmate throughout the plethysmograph testing procedure. *Compare, Pierce v. Smith*, 117 F.3d 866, 875 (5th Cir.1997) (intrusiveness of search was minimal where urine sample was collected behind closed door and without monitor). The testing procedure is not videotaped and there is no threat of pain or harm to the inmate.

The court thereby finds the legitimate governmental interest in rehabilitation outweighs the intrusion inherent in the plethysmograph testing as it is conducted at LCF.[17]

The decisive and remaining inquiry is whether the treatment program itself bears a rational relationship to the rehabilitative purpose. *Dunn*, 880 F.2d at 1196. "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 1194 (*quoting Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254).

Although penile plethysmograph testing is used in other sex offender treatment programs, the testing procedure has garnered only limited acceptance and credibility by the courts.[18] The reliability and usefulness of the testing outlined in the present case is further diminished by the DOC "incentive" program which does little to render an inmate's participation truly voluntary, and by the marginal training and expertise of the staff.

While the usefulness and reliability of the plethysmograph testing in the SATP Program at LCF may be strongly questioned, defendants' decision to employ the testing in the manner outlined in the record must be afforded broad deference unless the testing and use of the private information thereby obtained is devoid of probative and productive utility toward the stated rehabilitative purpose.[19]

possibility of 'accommodating' a prisoner's fourth amendment right by some other means would not arise." *Dunn*, 880 F.2d at 1194 n. 3.

**17.** However, the collection of the responsive data from the plethysmograph testing is afforded minimal confidentiality. It is uncontroverted that plethysmograph test results are discussed in the group therapy sessions. There appears to be little attention to or justification for the disclosure of this sensitive and private information. *See e.g. Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("other privacy-invasive aspect of urinalysis is, of course, the information it discloses concerning the state of the subject's body"); *Skinner*, 489 U.S. at 617, 109 S.Ct. 1402 (analysis of test data is further invasion of privacy interest).

**18.** For evidentiary purposes in the courtroom, plethysmograph results have not been accepted as reliable enough for predictive or identification evidence in criminal cases, *see e.g., State v. Spencer*, 119 N.C.App. 662, 459 S.E.2d 812 (1995) (trial court properly excluded psychologist's testimony regarding plethysmograph testing, scientific community divided as to the relia-

bility of the test to measure sexual deviancy), *rev. denied*, 341 N.C. 655, 462 S.E.2d 524 (1995), or in cases involving child custody or the termination of parental rights, *see e.g., In the Interest of A.V.*, 849 S.W.2d 393, 399 (Tex.App.1993) (reservations noted regarding acceptance by scientific community of plethysmograph as valid indicator of sexual preference or disorder).

But see, *State v. Riles*, 135 Wash.2d 326, 345, 957 P.2d 655, 664 (1998) (use and value of plethysmograph as treatment device recognized; testing provides useful information regarding the sexual arousal patterns of sex offenders, and data obtained can be used to assess baseline arousal patterns and therapeutic progress during treatment).

**19.** The prison context of plaintiff's claims is clearly decisive. Compare *Harrington v. Almy*, 977 F.2d 37 (1st Cir.1992), in which a suspended police officer challenged the city manager's demand that the officer undergo plethysmograph testing as a condition of reinstatement. The Circuit Court reversed the grant of summary judgment to the defendants, noting the invasive and offensive nature of the plethysmograph testing, the unreliability of the procedure, and the lack of

Having considered the scope of the intrusion, the manner in which it is conducted, the justification for the procedure, and the place it is conducted, *Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861, the court finds the plethysmograph testing in the SATP Program at LCF intrudes upon plaintiff's constitutional right to privacy and bodily integrity, but finds defendants' governmental interest in rehabilitation outweighs plaintiff's right to be free from such intrusion. The court further finds the challenged testing procedure, and the related operation of "incentive" policy IMPP 11–101, are both rationally related to the legitimate penological goal of rehabilitation of sex offenders, and reasonable enough to satisfy the review required under *Turner v. Safley.* Summary judgment is granted to defendants on plaintiff's Fourth Amendment privacy claim.

Pursuant to the court's Order dated April 23, 1996 (Doc. 94), the court enjoined defendants from coercing in any manner plaintiff's acceptance of or participation in SATP programming until the merits of plaintiff's claims were decided. The court continues this injunctive relief pending the final outcome of any appeal in this matter, or the termination of the time for filing an appeal.

IT IS THEREFORE BY THE COURT ORDERED that summary judgment is granted to plaintiff on plaintiff's Fifth Amendment claim.

IT IS FURTHER ORDERED that summary judgment is granted to defendants on plaintiff's privacy claim.

IT IS FURTHER ORDERED that the temporary injunction granted to plaintiff in this matter (Doc. 94) is continued until the judicial disposition of plaintiff's claims are finalized through appellate review or until the time for seeking such appellate review has expired.

evidence that less intrusive means were not available. *Id.* at 44.